Whitehead, J.
This cause was tried before a special jury of the county of Hunterdon, and a verdict rendered for the plaintiff for the sum of five hundred dollars.
Upon the .rule to show cause why the verdict should not be set aside, the defendant assigns several reasons; but, upon the argument, they were all abandoned, except the fifth and sixth, charging misbehavior upon the jury, and that the verdict was obtained by lot.
In support of these reasons, sundry depositions have been taken as to what occurred during the progress of the trial, in the presence of the jurors, and the deposition of the constable as to what took place in the jury room. It appears, by the testimony, that the cause excited more than ordinary interest; was the subject of conversation in bar-rooms, and at the public tables in the taverns; and that there was considerable speculation as to the finding of the jury. I can find, in these affidavits, no evidence of misconduct on the part of the plaintiff. It is not proved that he was present at any of these conversations, or advised them, or that he or his friends, in this or in any other manner, attempted to influence the minds of the jury. The practice of conversing upon the subject of a cause during its progress, in the presence of the jurors, should be reprobated. But from the open and public manner in which the business of our courts is conducted, it can hardly be expected that a cause of an exciting nature should not elicit an expression of opinion from some persons as to the probable result. The expression of such opinions, however, even in the presence of the jurors, is nota sufficient ground for disturbing a verdict.
A more serious difficulty arises upon the deposition of the constable. He testifies that he was in the room part of the time— that “it was eahidated with the jury” that each one should mark *451 a particular sum on a piece of paper j that they should be brought together and see how they would stand ; that it was proposed by some one of the jurors to throw the papers into a hat, but whether it was done or not he does not recollect. He recollects that there was a proposition, by some one of the jurors, to divide the amount of the sums by a certain number, but what that number was he does not recollect; nor does he recollect whether there was any division. At the close of his principal examination, he says : “ I forget now whether there was a proposal to throw the sums marked by the jury, into a hat or not.” This affidavit is vague, indefinite and contradictory. What he means by the expression, “ it was ealeulated with the jury that each one should mark, &e.;” whether it was agreed by them to mark, or whether there was a conversation about the propriety of marking, is altogether uncertain. On his cross-examination, he states, that he was in the room with the jury two or three times, and was finally ordered out, and did not return. That it was probably two hours after he was ordered out, before they agreed upon their verdict, and thinks they had time enough to deliberate and talk the matter over after he left the room.
A paper was proven, by this witness and others, to have been found in the jury room, in pieces, and, being put together, exhibited twelve different sums, from 5 to 3,000 dollars, amounting in the aggregate to 6,140 dollars, divided by the number 12, showing a quotient of 510 dollars, all in the hand writing of one of the jurors. This witness believes these sums to be the sums marked by the jurors. He does not, however, know that the jury arrived at their verdict by dividing the amount by the number twelve, or by consultation : nor does he recollect hearing any one propose to find a verdict according to that result.
It appears to me, that there is not enough in this affidavit, independent of the paper, to raise a serious doubt as to the propriety of this verdict; but when taken in connection with the paper, without other explanation, there is enough to create in the mind a painful suspicion that these special jurors, selected for their high moral character and intelligence, have, in violation of their oaths, found a verdict otherwise than by a deliberate and dispassionate consideration of the evidence in the ease. But is there, in this affidavit, sufficient proof of an agreement by jurors *452 that their finding should be determined by the manner the figures upon the paper would seem to indicate ? If there be, then, in the absence of any counter-proof, this verdict should be set aside. For every verdict should be the result of the exercise of judgment and reflection, and whenever it is made to appear to the court, by satisfactory proof, to have been the effect of chance or lot, or any other contrivance, it will be set aside. 1 Sfrange, 642; 1 Durnford and East, 11; 15 Johnson’s Rep. 87, 88; 1 Cowen, 238; 10 Wendell’s Rep. 595.
The doubt of the propriety of the verdict, created by this deposition, is entirely removed by the affidavits of two of the jurors. It appears, by their depositions, that as the jurors were backward in expressing their opinions, it was proposed that each of them should mark down on a piece of paper what he thought the verdict should be; and this having occasioned some conversation among them, as to marking and dividing, one of the jurors stated to his fellows, that it would not do to arrive at a verdict in that way, and if that was their intention he would not mark. That a verdict made up in that way would be set aside. It was then observed, that the marking should have no other effect than to draw out the opinions of the jurors. That with this understanding, they each put down on a separate piece of paper, what he thought the verdict should be. The papers were thrown upon the table, and afterwards, as they were taken up and the sums announced, one of the jurors wrote down the several sums, and as a mere matter of curiosity, and without any understanding with the other jurors, added them up and divided the aggregate amount by the number twelve. The paper upon which this calculation was made, is identified as the one found in the jury room and referred to by the constable in his deposition. It further appears by their depositions, that the jury, after this, remained together in free discussion upon the subject, for the space of an hour and a half or two hours. And they both testify that, in their opinion, the verdict was the result of reflection and deliberation on the part of the jurors.
But we are here met with an objection by the counsel for the defendant, that these affidavits cannot be received. That the rule of law shuts the mouths of these jurors. It is insisted that although their characters are assailed, and they are *453 charged with gross misbehavior and a palpable violation of a sworn doty; they must silently bear the odium, and the party whose right to the verdict is questioned, is to be deprived of their evidence in its support. But upon what principle is their evidence to be excluded ? They have no interest in the case. They are not called upon to allege their own turpitude. They make no charge against their fellow jurors whereby they would be subjected to the censure or animadversion of the court. It is however said, that upon general principles, affidavits of jurors cannot he received to support, contradict, correct or destroy their verdict, and that this must necessarily be so in order to preserve the purity of the administration of justice. In attempting to support this general proposition, a great number of cases were read, but it will be found on examination, that in no one of them is the principle decided, that when the jurors are charged with misbehavior in the jury room, they shall not be heard in their own exculpation : and I can find no such case. The principle settled by the authorities read by the defendant’s counsel is this, that the affidavits of jurors cannot be received to contradict or destroy their verdict.
In Vasie v. Dexaval, 1 Durnford and East 11, the motion was to set aside the verdict upon an affidavit of two jurors who swore, that the jury being divided in opinion tossed up, and that the plaintiff’s friends won; the court refused to receive the affidavit, and say, they must derive their knowledge from some other source.
In Jackson v. Williamson et al. 2 Durnford and East, 281, all the jurymen joined in an affidavit stating their intention to have been to give the plaintiff an increased sum for damages, but the court refused it, saying, that it would introduce a very dangerous practice if they were to admit such an affidavit. To the same effect is the case of Rex v. Woodfall, 5 Burroughs, 2667.
In Lessee of Cluggage v. Swan, 4 Binney, 150, the question was, whether the testimony of the jurors themselves was admissible to impeach their verdict upon the grounds of misconduct, and the court ruled it was not. Although this case was relied upon by defendant’s counsel, I can find nothing in it, that countenances the doctrine, that affidavits of jurors are not admissible in support-of their verdict. The question which the learned *454 judge in this case argued with so much ability was, whether it could conduce most to the advantage of justice to admit or exclude the testimony of jurors touching their own misconduct in order to vitiate their solemn verdict. The point was, upon receiving the'affidavit of a juror, that the verdict was decided by lot.
In Coster v. Merest, 7 Common Law Reports, 433, a rule for a new trial-had been obtained on an affidavit, that handbills reflecting upon the plaintiff’s character had been distributed in court at the time of the trial, and had been seen by the jury. The court refused to admit the affidavit of the jurymen, that no such placards had been shown to them. This is the only authority I can find, that has the appearance of supporting the defendant’s case. But aside from the propriety of this decision which I think may well be questioned, it will be observed, that there was here no charge of misconduct on the part of the jurors and consequently no call upon them “ to clear themselves by oath.”
The reasons for rejecting the testimony of jurors charging themselves and their fellows with misconduct are, that it would tend to defeat their own solemn act under oath where third persons are interested : would open a door .to tamper with jurymen after they bad given their verdict, and might be the means in the hands of a dissatisfied juror, of destroying a verdict at any time after he had assented to it. For these reasons courts have rejected this evidence. 1 Penn. Rep. 387; Coxe, 32; 2 Southard, 486; 2 Halsted, 51.
But this is a very different case. These jurors instead of charging themselves and their fellows with misconduct, are charged by the constable who attended them, with gross misbehavior. And no one will seriously pretend, that the same reasons exist in the one case as in the other, for rejecting their evidence. There is manifest injustice in refusing to this plaintiff the benefit of their evidence, and the most flagrant injustice in denying to them the privilege of exculpating themselves from a sérious charge reflecting upon their characters as men.
But we are not without precedent for the admission of this evidence. In the case of Smith v. Cheetham, 3 Caines Rep. 56, a motion was made to set aside the verdict, for irregularity in *455 the jury, upon an affidavit of the constable who attended them, that lie saw the jurors take a pen and mark down what he believed and understood to be the sum that they thought proper to give as damages, and that he understood the whole sum should be divided by twelve, and the quotient to be the verdict. And that two oí the jurors afterwards owned to him, that the verdict was determined in that way. Livingston, judge, in commenting on this evidence says, “stronger than all this is the silence of the jurors themselves. Exculpatory affidavits would hardly be rejected, and yet not one is produced. We cannot suppose any juror would be so regardless of character, and so insensible to the calls of justice as to deny the plaintiff so small a boon.”
In Dana v. Tucker, 4 Johnson’s Rep. 487, the court say, “ The better opinion is, and such is the rule adopted by the court, that the affidavits of jurors are not to be received to impeach a verdict, but they may be admitted in exculpation of the jurors and in support of their verdicts.” This decision is cited by the Supreme Court of Pennsylvania, in 4 Binney’s Rep. 150, above mentioned, without disapprobation by the Court.
In Jackson v. Dickerson and Thompson, 15 Johnson’s Rep. 309, five of the jurors made affidavit as to the question of fact submitted to them. On the argument of the motion for a new trial, the reading of these affidavits was objected to, but the court permitted them to be read, saying, “ the information afforded by the affidavits of the jurors is not to impeach, but to support the verdict really given by them.”
I am therefore of opinion, both upon principle and authority, that the depositions of these jurors should be received in evidence, and as they remove all doubt in regard to the misconduct of the jurors in this case, I think the rule to show cause should be discharged and judgment rendered for the plaintiff.
IÍORKbi.ower, C. J. concurred.
White, J.
This suit was brought by William Kennedy, against Archibald for and tried at the Hunterdon Circuit, before his Hon. Justice Dayton, in 1839; when a verdict was rendered in favor of the plaintiff for 500 dollars damages. On the postea being filed, the defendant obtained a rule to show cause *456 why a new trial should not be granted; and assigned many reasons, but on the argument, reliance is principally placed on the 5th, which is that thejury misbehaved.
In support of that reason.: it is proven by the affidavit of Mr. Hamilton, one of the counsel for defendant, that he had inquired of the constable, how the jury came to such a result, and was by him informed, that they marked for it, and that he and defendant saw and found in the room where thejury had been, immediately after they left it, fragments of paper, on which were figures; which fragments, when arranged, showed figures, numbers or sums set down, ranging from 3000 to 5, and when added together the whole amount is 6140.
David Chamberlain, the constable, who had charge of thejury, testified, that it was calculation with the jury, that each one should mark a particular sum on a piece of paper, and they would bring them together and see how they would stand, and that it was proposed by some one of the jurors, to throw the papers into a,hat, but whether it was so done, the witness could not recollect. That some of the jury were for 500 and some for 300 dollars, and one was for a low sum, but the amount not recollected. On further consideration, this witness said, he might be mistaken as to the 300; no distinct recollection of that, nor can he speak with precision, as to the low sum, but thinks it was in the neighborhood of 5 or 10 dollars, but he did not see the sums put on a piece of paper, but he recollects that it was proposed by some one of the jury to divide the amount of the sums by a certain number, but that number not recollected. The paper with numbers on it, he believes, shows the sums marked by the different jurors; and on further consideration, this witness said he forgets now whether there was a proposal to throw the sums marked by thejury, into a hat or not.
Andrew Sutton testified, that he was an assistant at the tavern of Mr. Beilis, at the time when this cause was tried; that some of the jurors, who tried this cause, put up there; he thinks one Fox S. Holcombe put up there; and whilst the trial was progressing, he heard it talked of at the table, and heard it said there would be a heavy judgment against the defendant. He heard different sums mentioned, but did not recollect any of the persons who made the remarks; and he says he may be mistaken as *457 to the names of the jurymen who put up there at Beiliss’ house.
David Hoffman testifies, that at the same term, at the dinner table at the inn of Mr. Hart, he heard Nicholas Lazzelier say, that the verdict ought to be 1,000 dollars; and this was spoken in a voice, he thinks, which Archibald Kennedy, at the other end of the table, might hear; but he don’t know that any juror was there ; this was during the progress of the Srial.
¥m, R. Moore, a witness who tended bar at one of the public houses in Flemington, testifies, that after the verdict was rendered, the jury came to that house, and had some wine, which was paid for by Wm. Kennedy.
Jacob Apgar testifies to some talk in the bar-room at Mr. Hart’s, and Lazzelier said the verdict would or should be 1,000 dollars; this was at the house where the defendant and his counsel and witnesses were: a bar-room talk — not specially to the jury.
William Thompson, Esq. the attorney of the defendant, testifies, that during the progress of the cause, in the evening of Wednesday, he saw some man conversing with Judge Opdyke, one of the jury, at the corner of a house. Did not know the man, but heard him say the verdict ought to be 500 dollars.
Upon this evidence, the court are.called on to set aside the verdict of a jury for misconduct — misbehaving themselves during the time they were sitting on the trial of an issue which they were sworn to try on the evidence given to them in court.
The trial by jury is justly prized in our country ; it is called the bulwark of our liberties; and to preserve it pure should be the endeavor of all good citizens, and more especially all the courts of justice. If jurors are suffered to abuse the trust and confidence placed in them by the community, soon will that much extolled mode of trial fall into disrepute and disgrace, and consequently into disuse.
But jurors, who are selected by the first officers of the county, from amongst the most moral, intelligent and upright freeholders of the county, sworn solemnly to try and true verdict find on the evidence which they, under the forms of law, are permitted to hear, and who are punished for misconduct by fine and imprisonment, and subject to the charge of perjury, have a right to expect, and ask, that they may not be charged with criminal con *458 duct on suspicion, or even on slight or presumptive evidence. Tt is to be presumed that honest men, when they render a verdict under the solemnities of an oath, do it with a full conviction of the truth of that verdict. This is what all good and charitable men must presume, and courts of justice are bound to presume, until the contrary, is proved ; but where a charge is made of actual, wilful, corrupt misconduct, in violation of oaths and every duty to God and man, I ask, should a juror be charged without the strongest direct proof from a pure and unbiassed source.
On the other hand, in this country, where everything which a man holds dear, his life, reputation, liberty and property, is, in our court, placed in the hands of jurymen, it is of importance that no fear of being obliged to punish jurors for misconduct, either by fine or imprisonment, should deter courts from hearing and strictly, enquiring'into their conduct and proceedings: whilst they are in the exercise of those great and momentous powers, purity of motive, uprightness and integrity of conduct should be required, and even such conduct as would lead to suspicion, should be avoided.
Itis'not at this day a question whether, if ajury determining a verdict by cross and pile, or hussle cap, or any other chance game, their verdict can be sustained in a court of justice. How it ever could have been made a question in a country where jurors were sworn to try and determine the facts and law honestly, and make their verdict the result of deliberation and strict inquiry for-truth, applying their best, impartial and unprejudiced judgment to the case, as made out by evidence, seems a matter of some surprise.
But if jurors will depart from their line of duty, will formally swear to do justice and find truly, and then take chance or lot, or suffer corrupt motives to influence them; or if they suffer themselves to be tampered with by unprincipled parties or party partizans, and act corruptly, I trust and hope, for the sake of justice, and purifying the tribunal to which all look for justice, no fear of being called on to measure out to jurors- the punishment which such conduct would merit, will ever deter a court from inquiring into the truth, and afford the aggrieved suitor, his proper redress, though the jury may fall into disgrace in the conflict.
*459 But in this case, of what misconduct is the jury accused ? If I give a right construction to the term used by the constable, he says it was proposed or talked about by the jury, that each juror should mark on paper the sum which he thought the plaintiff should have, or recover in damages. Now this, after the jury had been some time together, and must have, by general consent, come to the conclusion that the plaintiff was entitled to something, at any rate, entitled to their verdict; and I can see no serious objection to a proposal of this kind being made, in order to ascertain the different views of the jurymen as to the amount of the damages. Indeed I don’t know any better mode which could have been proposed in a case like this, which was not a subject of calculation, and where no valuation of property was to be made as the foundation of the verdict. And it appears by the evidence of the constable, that was to see how they would stand ; this witness did not see the several sums or numbers put on the paper; he believes the paper produced here on the argument, and referred to by some of the witnesses, contains the sums marked by the several jurors, but he gives us no fact on which this belief is founded ; he speaks of some numbers having been mentioned, but he speaks of them with great uncertainty as to the sums. He spoke of the 300 dollars, but he says of that he may bo mistaken, and as to the low number, he says it may have been five or ten dollars. And after swearing that it was proposed to put the numbers in a hat, he says he is uncertain ; he can’t now recollect that it was so proposed.
The belief of this witness, founded on the facts, is not satisfactory to ray mind that he has knowledge of the paper found in the jury room, or that he had sufficient foundation for the allegation which he made to the counsel, that the verdict of the jury was the result of marking on paper. Hiere is nothing in the evidence of this witness, on which I can accuse the jurors of misconduct, or wilful departure from their duty, for which their verdict should be set aside.
And if we look to the evidence which relates to the conduct of the jurors outside the jury room, I can see no one fact substantiated, which shows misconduct of the jurors, or any of them, or even ahy attempt to labor the jury.
Their evidence that the people talked in the bar-rooms of all *460 the taverns, and at the dinner tables, but it is not pretended, on the evidence, that the jurors held any conversation with any one on the subject of the trial, nor is it proven that they were even present and heard the observations made by those busy bawlers, as to what the verdict should or would be.'
It is proved, to be sure, that Judge Opdyke, one of the jurors, was seen talking at the corner of the house, with some man, who said the verdict should be 500 dollars; this man was not known to the witness. It is not pretended that it was one of the parties; and 'from anything which appears in evidence, it may have been a fellow juror; and surely, the jurors are not prohibited from talking together respecting the matter or cause which is on trial before them.
There is one other matter, which was after verdict rendered, and could have no effect upon it. I mean the treating the jury. And although it would be desirable if this practice were discontinued, and I think everything which can with propriety be done should be done, to discontinue it in our court; yet I do not see that it affords sufficient ground to accuse the jury of malpractice, or that a verdict should, for that cause, be set aside.
On the whole, I think there is nothing in the evidence to satisfy a rational mind, that the jurors in this case acted corruptly, or determined their verdict in any other way than on due consideration.
But if we look at the affidavits of the jurors, there is another fact made out, in addition to those matters testified to by the constable. I allude to the figures or numbers put down on the slip of paper found in the room. This evidence proves that those figures were made by one of the jurors, and from sums marked or put down by the several jurors. But this same witness shows that it was doné by him inadvertently, and without any intention that it should have any influence on the verdict of the jury, and that the numbers marked and placed on the table, were not considered as binding on those who made them.
And when we see that, after this transaction, the jury were together for a period of two hours, consulting on their verdict, and which was ample time for them to confer together on the matter before them, are we bound to presume that they were influenced by their marking ? Does not charity require us to be *461 lieve that they formed their verdict on due consideration, rather than to conclude that it was made up by dividing the total amount of the several numbers marked, by the number 12, or any other number ?
I have formed my opinion without taking into consideration the oath of the'juror, not because I think the oath of a juror can in no case be received, but because I did not find it necessary to resort to that evidence in this case.

Let the rule to show cause he discharged.

Nevius, J.
This is an action of slander, tried at the Hunter-don circuit, in October term, 1839, and a verdict rendered for the plaintiff for five hundred dollars.
Various reasons have been assigned for setting aside this verdict. In examining the case, I deem it unnecessary to notice any other than the fifth and sixth reasons assigned, for the others are not maintained either by the facts.
These reasons are founded Upon the charge of misbehavior of the jury, and that the verdict was obtained by lot. If they are true, it is good cause for the court to interfere and set aside the verdict. By the testimony, read in support of the rule to show cause, it appears:
1st. That immediately after the verdict was rendered, there were found in the room occupied by the jury, during their deliberations, fragments of paper, containing certain sums or numbers, that the same were collected and put or pasted together, and appear, as now exhibited, to contain twelve different sums, arranged in a column, and ranging from $3,000 to $5, and amounting, together, to the sum of 6,140 dollars, which, being divided by the number 12, leaves the sum of 511 dollars. It is further proved, by the constable who attended the jury, after they were sent out to deliberate on their verdict, and who was present with them a part of the time, that it was a “calculation ” [using his language] “ with the jury, that each should mark a sum on a piece of paper, and they would bring them together and see how they stood.” One of the jurors proposed throwing them into a hat, but can’t say whether it was so done. One of the jurors *462 was for 500 dollars, one for three hundred dollars, and one for a low sum, 5 or 10 dollars. He did not see the sums put down on paper. One juror proposed that the aggregate of the sums ishould be divided by a certain number, but don’t recollect what number. Whether this was done or not, he can’t recollect, but about this time he was requested to leave the room, and did so. The witness cannot say whether the jury arrived at their verdict in this way, or by “ consultation.” He don’t know how long the jury remained in the room after he was sent out. If the case stopped here, I should feel constrained to set aside this verdict; for although it is not distinctly proven that the jury arrived at their verdict in the mode referred to by the witness, yet the circumstances are calculated to excite a strong suspicion of misbehavior in the jury, and that they did adopt this mode of getting at their verdict. And if it is true that the verdict was found in this way, this court would not hesitate to set it aside. All principle and all authority require it. It is nothing less than obtaining a verdict by lot, which has been repeatedly determined to vitiate it. Bunbury’s R. 51; Barnes’ Notes, 441; 15 J. R. 87; 1 Cowen, 238, and 10 Wendall, 595. In the latter case, after the ballot had resulted in favor of the defendant, on an intimation from the constable that the proceeding was unlawful, the jury resolved that the ballot should go for nothing; nevertheless, having found for the defendant, the court set aside the verdict. Verdicts obtained by marking, or in any way by lot, will beset aside, even if, in the opinion of the court, it should be right in itself. Strange, 642. But this charge of misbehavior by the jury, sustained by the evidence above mentioned, is denied by the defendant, and, in support of his denial, he has produced the affidavits of two of the jurors who rendered the verdict. Before examining these affidavits, it becomes necessary to inquire whether, by law, they can be read. It is admitted by the counsel, that affidavits of jurors cannot be received to impeach their verdict. This has long been esteemed as settled law, though anciently it was held otherwise, and up to the time of Lord Mansfield, affidavits of jurors were received, both to support and to impeach their own verdict. Barnes, 441. Since that time, the affidavits of jurors, to impeach their verdict, have, by our courts *463 as well as by the English courts, been uniformly rejected, on the ground of policy. Coxe, 32; South. 486; 1 Penn. 390; 2 Hal. 51. And the defendant contends that the same rule should exclude affidavits of jurors to support their verdict. That if one juror is permitted to swear a verdict was rightly found, another ought not to be prevented from swearing that it was found by lot. That if the merits of a verdict may be inquired into by the mouth of a juror, its demerits may likewise be inquired of. That if a juror can be examined, touching his verdict, he may be cross-examined. And I confess this argument appears, to my mind, to be sound. For if the door is once opened to the affidavits of jurors, in support of their verdict, it will soon lead to arguments in the shape of affidavits in their support, and it will become wholly impossible to obtain relief against improper verdicts, rendered by mistake, ignorance, misconception, fraud, or misbehavior. I am of opinion that a juror who has sworn to render a true verdict, according to evidence, cannot be called to sustain and strengthen, or explain that verdict by affidavit. If his verdict is impeached for misbehavior, by the oath of a constable or other third person, he must vindicate himself elsewhere, and in another mode, and not by reaffirming, under oath, that his verdict was lawfully and conscientiously obtained and rendered. Unless, therefore, this view of the subject is overcome by the force of authority, injudicial decisions, I shall be inclined wholly to reject the affidavits of the jurors, offered in this case.
Let us then examine these authorities: and, in doing so, I will confine myself to the cases cited, and which have been decided since the rule was established, rejecting affidavits of jurors to impeach their verdicts; for, before that time, courts would receive them both to impeach and support verdicts.
The first case cited, is that of Dana v. Tucker, 4 J. R. 487. In that case, a motion was made to set aside the verdict, and an affidavit of the constable was read, stating that the jurors agreed each to mark down the sum he thought fit to find, and dividing the aggregate by twelve, the quotient should be the verdict, and that the verdict was so ascertained. Similar affidavits of two of the jurors were read. On the other hand, the affidavits of two other jurors were read, stating that, after some deliberation, the jury unanimously agreed to find a verdict for the plaintiff. That *464 they then each privately marked the sum he was inclined to give; that eight of them marked 500 dollars, one 600, and one 50; that the aggregate of these sums was divided by 12, and they agreed that the sum so produced should be their verdict. Upon this case the court say: “ The better opinion is, and such is the rule adopted by the court, that affidavits of jurors cannot be received to impeach their verdict, but may be admitted to exculpate the jurors, and sustain the verdict; ” and they rejected the affidavits of the two former, and received the latter and refused the rule. From the report of this case, it appears that the counsel for the plaintiff cited the case of Smith v. Gheetham, 3 Caines, 57, and Lawrence v. Boswell, Sayer, 100. The court, in its opinion, refer to no authority. Now, if ever there was a case in which the impropriety, if not the absurdity of “ this better opinion,” could be made manifest, it was that case. The constable and two jurors swear positively that the verdict was obtained by marking for it, whilst two others are supposed to swear that it was not obtained in that mode. The affidavits of the former are rejected, and of the latter received, but upon what principle I am at loss to discover. Not, surely, on the ground that the former are entitled to less credit than the latter. Could it be on the ground of policy ? If so, the same policy would disregard the oath of eleven jurors, impeaching the verdict, either for mistake or misbehavior, whilst that of one only would be received as conclusive in support of it. I should indeed deem it difficult for courts long to maintain such policy. This decision was unquestionably made upon the authority of the opinions given by the judges in the case of Smith v. Cheetham, for there is no other case in that court, antecedent to that in 4 Johns. R. 487, where this “better opinion” or rule had been adopted. This, too, is the more manifest from the fact that, in the latter case, the court adopted, to a certain extent, some opinions expressed in that case, approbatory, or, at least, exculpatory of this mode of ascertaining the damages, and which, I feel sure, cannot and- ought not to be approved. To my own mind it is clear, that the verdict, in the case of Dana v. Tucker, should have been set aside, on the facts disclosed by the affidavits of the jurors who undertook to exculpate themselves. So far, then, as the Supreme Court of New York is concerned in this question, we are called *465 upon to examine carefully the case of Smith v. Cheetham, which is the basis of the decision in Dana v. Tucker, and has had its influence on all oilier eases involving the same question in that court. Its authority here must depend upon the correctness and soundness of its principles, and nothing else. In examining it, I lay out of view all the remarks of counsel on this argument, touching the political complexion of the times or the political character of the judges, for my respect for their high judicial character, their private worth and integrity, will not permit me for a moment to suspect the integrity of their opinions. What, then, was the case ?
An action for libel and a verdict for $200; motion to set it aside, on affidavit of constable, who attended jury, stating that one juror was for one cent damages, another for six cents ; that two jurors acknowledged to him that the verdict was determined by agreement that each should, put down such sum as he saw fit to award, and divided the whole by twelve, and that in this way the verdict was obtained. Emmett, who resisted the motion, remarked, in his argument, “ that the mode complained of was as pure and innocent as if effected by word of mouth or conversation.” And in delivering their opinion, which was seriatim, Spencer, J, said : “ That the affidavits of jurors, and, of course,, their confessions, could not be received ; that, according to English authorities, prior to the revolution, the affidavit of a juror could be received; that the case in 1 Keble, 311, and Barnes, 441, prove this, and ho cannot perceive any principle of law invaded by it. That the constable’s affidavit and juror’s confession prove the mode of arriving at the verdict. That such a practice would be dangerous in a high degree, and prevent discussion and examination essential to justice.” Livingston, J, remarked, that every verdict should be the result of deliberation, and not of lot or chance. That, in England, all verdicts obtained by the latter mode, were set aside; but Lord Mansfield would not suffer affidavits ol'jurors to be read, though, in one case, 1 D. and D. 11, such affidavit was read. And he adds, “ with proper submission to his Lordship, it appears the best and highest evidence of which the case admits.” He further says “ That exculpatory affidavits of jurors, would hardly bo rejected, yet none is offered; that this silence, with him, is conclusive of the truth- of the con *466 stable’s affidavitand refers to the cases in .Bunbury and Barnes. He will not adopt Lord Mansfield’s rule of “ shutting the mouth of jurors,” and is in favor of a new trial. Kent, J. did not object to this mode of fixing the amount of the verdict to be rendered, unless it appeared that some fraud had been practiced by a juror, by fixing upon a sum extravagantly high or low, and in bad faith ; and as no such fraud had been proved, he did not think the mode of ascertaining the average sum was exceptionable, if they thought it reasonable under the circumstances of the case, and that, therefore, the verdict should not be set aside. Justices Tompkins and Thompson gave no opinion. The verdict was set aside. From this statement of the case, this “ better opinion ” and the adoption of the rule in this court, “ that the exculpatory affidavits of jurors should be received,” does not appear. The only warrant for such a remark, is found in the opinion of Justice Livingston, “ that exculpating affidavits would hardly be rejected.” I conclude, then, that the case in 4 J. R. 487, founded as it undoubtedly is, upon the case last cited, finds no authority there for its conclusions.
It is not necessary to examine the other cases in that court, relied upon by the plaintiff’s counsel, so much in detail. The case of Sargeant v. -5 Cowen, 106, was where the jury had fallen into a mistake, from the omission of the judge to repudiate a position taken by counsel, in the argument, which was not sustained by the law of the case. The affidavits of jurors were received upon the professed ground of establishing the charge of a misdirection of the court, by its silence upon an important point, and because this was the only mode in which such misdirection could be proved. It is true that Justice Sutherland, who gives the opinion of the court, remarks that the decision in Dana v. Tucker, is in accordance with the best English authorities, and cites, in support of this remark, 4 B. and P. 829, and 1 T. R. 11. Both these cases were decided whilst it was yet the rule to receive the affidavits of jurors, both in support and in impeachment of their verdict. The case in 6 Cowen, 53, only confirms that of 5 Cow. 106, but goes no further. The case of Jackson v. Dickinson, 15 Johns. R. 309, was a case of an alleged mistake in the clerk, in entering the verdict, and the affidavits of jurors were received to correct it. The court there remark that they' *467 went to support the verdict really given. This is true, but they in no wise affect what was done by the jury in their deliberations in their room. I cannot perceive, therefore, that this case affects the question.
I deem it unnecessary to pursue this subject further, and conclude with remarking, that none of the cases relied upon by the plaintiff’s counsel, fully maintain the doctrine contended for, except that of Dana v. Tucker, and, in my opinion, that case is not founded cither in principle or authority. I think, therefore, that the affidavits of the jurors in this case, cannot be read, and that the rule to show cause should be made absolute.
Elmer, J. concurred with the opinion of Mr. Justice Nevius, but was not present when it was delivered.

Rule discharged,

Cited in Consumers' Coal Co. v. Hutchinson, 7 Vr. 25,