## Louisville & N. R. Co. v. Marshall's Adm'x.

Jan. 16, 1942.

130

H. T. Lively and Thomas E. Sandidge for appellant.

Wilson & Wilson for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

The tracks of the appellant and defendant below, Louisville and Nashville Railroad Company, at a point some five or six miles east of Owensboro run east and west. At that point defendant has a siding some two miles long paralleling its main line. On the north side of the main line runs State Highway No. 60, and about midway of the siding a county public road known as "Wright's Landing Road," running north and south, crosses at grade, at practically right angles, the main track and the siding. On January 1, 1940, the date of the accident herein, there was standing on the side track south of the main track a number of freight cars, the one next to the crossing being, according to the testimony, from 100 to 125 feet from it. On that day the deceased Elmer Marshall, who resided in Owensboro and was a stone cutter, went hunting, making the trip with his automobile. He crossed the track of defendant, approaching from the north, and parked his car south of the crossing some twenty or twenty-five feet from the defendant's right of way on the north side of Wright's Landing Road, having turned it around before parking it. A few minutes past three o'clock p. m. on that day a fast passenger train of defendant going east from Owensboro to Louisville collided with defendant while he was driving his automobile north on what is presumed to be his return trip home, resulting in smashing his automobile and killing him.

His widow, the appellant and plaintiff below, was appointed administratrix of his estate and later filed this action in the Daviess circuit court to recover damages for her husband's death. The negligence as averred in the petition was that "the defendant, by its agents and servants, so negligently and carelessly and with gross negligence and carelessness so *operated,* maintained and controlled its railroad and trains that one of its trains ran into and against said Elmer Marshall and the automobile in which he was riding at the time," &c. (Our emphasis.) Judgment for $37,136.04 was prayed. The answer denied the negligence charged in the petition,

with a plea of contributory negligence on the part of the decedent, which in turn was denied by reply, and at the trial the jury returned a verdict in favor of plaintiff for $13,538.16, which on its face shows a most exact calculation on the part of the jury (although no special damages were claimed), or manifests a suspicion that the method by which that exact sum was arrived at was one, to say the least of it, condemned by the law. Defendant's motion for a new trial was overruled and from the verdict and judgment pronounced thereon it prosecutes this appeal, complaining of many errors set out in the motion; but we deem it sufficient to refer to and discuss only these three (1) refusal of the court to sustain defendant's motion for a directed verdict in its favor; (2) error in the instructions, and (3) error of the court in refusing to permit defendant to prove by the jurors that the verdict was arrived at by lot. They will be disposed of in the order named.

1. There was no eye-witness to the immediate accident, except that of the engineer and fireman, both of whom testified that, not only were whistles blown as required by the statute, Kentucky Statutes, Section 786, but likewise the bell was ringing and had been since the train left Owensboro. The train consisted of the engine, tender and seven coaches, and was traveling about fifty miles per hour. The railroad track for about two miles both east and west of the crossing was not only straight, but on perfectly level ground and comparatively open. The only possible obstruction to the view of a traveler going in the direction the deceased was traveling at the time of the collision was the standing box car or cars some 100 or 125 feet on the side track in the direction from whence the train was approaching the crossing. The engineer and fireman testified that the first they saw of the approaching automobile to the track upon which the train was traveling was when it emerged from behind the standing freight car on the side track. Before arriving there it was on lower ground than the railroad track some few feet, there being a slight grade from the place where defendant started home to the main railroad track. They testified that the emergency whistle was then given and the brakes thrown on, but it was too late to prevent the collision. The brakeman also testified to the giving of the signals of the approaching of the train to the crossing, but he was in the rear coach and did not see what happened at the immediate spot, with reference

to either the approach of the train or the decedent to the crossing. Some neighbors living adjacent to the crossing testified that they did not hear either the signal for the crossing, nor the ringing of the bell, and two of them testified that the whistle was not blown, but none of them appear to have seen the decedent as he drove his automobile upon the track of defendant, but they did see at least a part of the collision after their attention was especially focused upon the spot by the alarm whistle and the applying of the brakes.

Some witnesses also testified that the front wheels of the automobile in which decedent was traveling would have to approach near to the south rail of the main line of defendant's track before a traveler in the automobile could see around the standing car or cars on the side track in the direction from which the train approached. However, four photographs of the situation were taken and introduced in evidence, and it is shown by uncontradicted testimony that they represented the situation as it was at the time of the accident. They clearly demonstrate that the automobile did not have to approach the main line as close as those witnesses testified to in order for the occupant to discover by sight the approaching train from the direction in which the fatal one in this case was traveling, and which we conclude is much more persuasive than the mere opinion of the witnesses testifying to the contrary.

Moreover, all of the witnesses for either side who testified upon the issue stated that the standing car or cars at the place indicated did not obstruct the view of one on the south side of the right of way, because the smoke stack of the approaching train extended above the standing car or cars and that on this particular occasion the witnesses saw it as the train was moving toward the crossing, and that considerable smoke was emanating therefrom so as to clearly indicate the approaching of the train, and the same witnesses also testified that one so situated could see the wheels of the coaches through the space under the standing cars. They also testified that the sparsely standing timber at the edge of the right of way furnished no material obstruction to a view of the train as it approached the crossing to one located on the south side of the right of way which was the one from which the decedent approached the track.

Under such facts defendant's counsel argue in sup-

port of this ground (1) that the evidence upon the issue of the giving of required signals so preponderated in favor of defendants complying therewith, that, under the recent case of Nugent v. Nugent's Ex'r, 281 Ky. 263, 135 S. W. (2d) 877, in which we discarded the application of the scintilla rule, their motion for a directed verdict in favor of their client should have been given. But we are not inclined to agree with that contention, since we conclude that the testimony of plaintiff's witnesses that the required signals were not given created more than a scintilla of proof on that issue so as not to authorize the application of the rule adopted in the Nugent case. It is also argued in support of this ground that the evidence, although it might establish negligence on the part of the defendant, clearly showed contributory negligence on the part of the deceased, but we are likewise unable to adopt that view. It will be noted that no one saw what occurred with reference to decedent immediately before the collision. To charge him with contributory negligence in his approach to the crossing, in the absence of some proof as to his actions immediately prior thereto, would be nothing less than presuming negligence on his part from the mere surroundings and conditions locally prevailing at the time. But neither negligence nor contributory negligence is to be presumed. Of course, there might be facts and conditions where no other reasonable hypothesis could be drawn than that of contributory negligence on the part of the one who encountered the danger. But we are not inclined to the conclusion that this case is one of them, and that the issue of contributory negligence was one for the determination of the jury. We, therefore, conclude that the court did not err in overruling defendant's tendered peremptory instruction in its favor, and we hold that this ground under the evidence appearing in the record is without avail.

2. The criticism of the instructions is more or less manifold, but it is chiefly directed to instruction No. I submitting to the jury the duty of defendant to give the statutory signals on approaching the crossing, and that if it failed to do so and its failure was the proximate cause of the collision, then a verdict for plaintiff should be returned, unless decedent was guilty of contributory negligence but for which the collision would not have occurred, all of which clearly followed the allegations of the petition wherein the negligence relied on was averred. But the instruction went further and said to

the jury that if it believed that the crossing was over a much traveled thoroughfare and was an unusually dangerous one, and that the blowing of the whistle or the ringing of the bell was not sufficient to give reasonable notice of the approach of the train thereto and the defendant knew that fact, or could have known it by the exercise of ordinary care "then it was the further duty of the defendant and its servants in charge of the train at the time to use such other means to *prevent* injury to travelers at said crossing as in the exercise of ordinary judgment might be considered necessary by ordinarily prudent persons operating a train, and if the jury believe from the evidence that the defendant and its employes in charge of its train at the time it struck and killed the decedent, Elmer Marshall, failed to ring the bell or sound the whistle as herein set out, or to provide other methods to *warn* the traveling public of its approach to said crossing, if the jury believe the facts of this case required of the defendant and its servants in charge of its engine, in the exercise of ordinary care, to employ other means of warning of the approach, and as a direct result of such negligence, if any, on the part of the defendant and its servants, the decedent, Elmer Marshall, was killed, then the law is for the plaintiff and the jury should so find, unless they believe as in instruction No. II." (Our emphasis.)

The objections to the incorporating in that instruction of what is known as the "Dangerous Crossing" doctrine are threefold, (a) that the negligence charged in the petition was only that committed in the *operation* of defendant's colliding train; (b) that even if the pleading was broad enough to authorize such an instruction, then the one given was erroneous in that it required the extra means to be employed by defendant to be sufficient "to *prevent* injury to travelers at said crossing," and (c) that under the proof in this case the crossing where the fatal collision occurred could not in any event be considered as an extraordinarily dangerous one so as to call for the employment of additional means of warning of the approach of the train to the crossing beyond that prescribed by the statute.

Objection (a) to the instruction would undoubtedly be sound if the premise upon which it is based was unqualifiedly correct, i. e., that the allegation of negligence in the petition complained only of the operation of the

train, and which has been so held by us in a number of cases, and it has become the settled rule in this jurisdiction. But our interpretation of the charge made in the petition is that it is broad enough to embrace negligence, if any, in failing to take extraordinary precaution if the crossing was an extraordinarily dangerous one, since it will be observed that the charge in the petition is "gross negligence and carelessness," not only in the *operation* of the train, but also that it was guilty of negligence and carelessness in the "maintenance and controlling of its *railroad* and trains." However, this question need not be finally determined in this case for reasons hereinafter stated in discussing objection (c), and for which reason we will not further pursue the discussion of it.

Objection (b) is no doubt well founded if it too was properly premised, since we have uniformily held that a defendant in an action to recover for negligence is not required in the exercise of the requisite care to take steps and observe duties that would *prevent* the consequent injury and damage. In cases of this character involving the warning necessary to be given of the approach of trains the extent of duty on defendant's part is to provide such means and take such steps as an ordinarily prudent man would do in the same or similar circumstances, since there is never a guarantee of the prevention of injurious results for a failure to take the necessary precaution, or to insure that result. If, therefore, the instruction in this case had gone no farther than is assumed by counsel, then this criticism of the instruction would be fatal. However, it will be observed from the excerpt taken from it supra, that, following the use of the word "prevent," the jury was told that it would be the duty of the defendant if the crossing was of the character to require it "to employ other means of *warning* of the approach" of its train to the crossing, and which we conclude was sufficient to inform the jury that the extra means to be employed, in case the crossing was of the dangerous character indicated, were for the purpose of giving *warning* of the approaching of the train and not such as would *prevent* a collision at the crossing to a traveler on the highway. However, were we mistaken as to the effect of the saving language to which we have referred in both objections (a) and (b), then the necessity of a final correct determination of either of them becomes immaterial in this case for the

reasons stated above concerning our conclusion on objection (c) which we will now proceed to consider.

The only fact that is urged or could possibly be urged to make the crossing here involved such a dangerous one at the time of the happening of the fatal collision, was the standing car or cars on defendant's side track west of and to the left of decedent as he approached the crossing in his automobile. We have seen that the testimony showed that, notwithstanding the more or less slight obstruction produced by those cars, before the traveler towards the track arrived at the point where he could see around them was not sufficient to deprive him of the ability to discover the approach of the train, not only by sight, but also by hearing. In order for one to know and realize that a train is approaching it is not requisite that he should be able to see the entire train if the conditions and surroundings are such that he could both see and hear the approach of the train, for, although his view of the entire train might to some extent be obstructed, in no sense of the word could it be claimed that the crossing as so conditioned could be classified as an exceptionally dangerous one calling for the application of extraordinary precaution on the part of the defendant railroad company, and no case cited by plaintiff's counsel holds to the contrary.

Of course, each case is bottomed on its own specific facts, and if obstructions of the view of the approach of a train to a crossing which have been erected or permitted by the railroad company and which are of a permanent nature and located so close to both the railroad and the highway upon which the injured traveler was moving at the time, then it, no doubt, could be said that the crossing had become a dangerous one calling for the application of the rule so as to make it an extraordinarily dangerous one the same as if the natural surroundings, such as topography of the area, sharp curves, bluffs and other effective obstructions, would create. Such was the character of crossing involved in the case of Louisville & N. R. R. Co. v. Treanor's Adm'r, 179 Ky. 337, 200 S. W. 634, from which the criticised instruction in this case is presumed to have been taken. Here, as we have seen, the surroundings of the crossing were perfectly level; the country was comparatively open; the railroad track was straight for more than two miles in the direction from which defendant's train was traveling, and the only

obstruction to the view of a traveler on the highway, going the direction that decedent was at the time, was the standing box car or cars located as much as or more than 100 feet from the road upon which he approached the crossing. Furthermore, such obstruction, as we have seen, did not, under the testimony adduced, totally obstruct decedent's view so as to prevent him from discovering the approach of the train from that direction. We, therefore, conclude that the court erred in submitting to the jury the extraordinary duties imposed upon a railroad company in approaching crossings that are extraordinarily dangerous, and for which reason the instruction was clearly erroneous.

3. The facts with reference to ground (3), urged in objection to the verdict and judgment, are these: After defendant had filed its motion for a new trial and before it was acted on, it amended its grounds, which amendment was supported by affidavit, by charging misconduct on the part of the jury in arriving at its verdict, and which it averred consisted in the jury upon entering its room for the consideration of the case, after determining the liability of defendant, entered into an agreement among themselves for each member to write down the amount that he thought the verdict in favor of plaintiff should be, which should thereafter be added and the sum divided by twelve ''and that they would be bound by the result, whatever it might be, and that the quotient would be returned as a verdict,'' which the appellant stated was done. It then stated that such facts could be proven by members of the jury, and it asked that the jurors be summoned to testify on that issue, which defendant alleged they would sustain.

It is the contention of plaintiff's counsel that a ''quotient verdict,'' while many times condemned by this court does not authorize a reversal of the judgment on the ground of either misconduct on the part of the jury, or that it was arrived at by lot so as to qualify the jurors as witnesses to prove the method employed by the jury in formulating it in cases where the jurors in adopting such method only agree to employ it for the purpose of ascertaining the average of what each juror conceived to be proper under the law and facts, and in the exercise of a conscientious discharge of a juror's duty to litigants. This court and many if not all others so far as we are aware, while condemning the employment of such method

has not regarded it as an error authorizing a reversal of the judgment, provided each juror reserved the right and was free to withhold his assent to the quotient arrived at as his correct verdict. Therefore, if the jurors agree to the quotient and make it their verdict, or agree to it substantially *after* the amount became so ascertained, then the verdict is regarded as not tainted with the forbidden practice of reaching it by any sort of chance so as to render it one reached by lot. Cases and authorities so announcing the practice are Clark v. Commonwealth, 201 Ky. 620, 257 S. W. 1035; Walton v. Commonwealth, 223 Ky. 393, 3 S. W. (2d) 764; 46 C. J. 156, Section 124, and 27 R. C. L. 847, Sections 19 and 20.

It will be observed that the two domestic cases to which we have referred are criminal prosecutions and Section 272 of the Criminal Code of Practice disqualifies a juror from testifying to what occurred in the jury room while arriving at the verdict, except that it was reached or made by lot. That provision is not found in the Civil Code of Practice, but we have applied it in civil cases the same as criminal prosecutions. One case in which it was done is Gartland v. Connor, 59 S. W. 29, 22 Ky. Law Rep. 920, on page 922. There are other civil cases in which the provisions of Section 272 of the Criminal Code is made applicable to civil cases. Indeed, there is no provision that we have been able to find in either of the Codes denouncing a verdict made by lot, except that contained in the section of the Criminal Code referred to. However, such a verdict is condemned by the rules of the common law on the ground that it is reached in a manner not contemplated when provision was made for the trial of cases by a jury. On the contrary, it was then intended that the conclusion of the body should be reached after a thorough consideration of the law and testimony heard at the trial, and in the exercise of an honest judgment of each juror as to what verdict should be rendered in justice to the right of all parties connected with the litigation. The embodiment of the law in general is so succinctly and clearly stated in the text to which we. have referred in 27 R. C. L., supra, that we have concluded to insert it as a guide to the courts and members of the profession in future trials. It says:

"19. Chance Verdict Generally.—The law demands of each juror an honest consideration of the rights of the parties litigant and the exercise of his best judgment,

guided by the law and evidence of the case. Therefore, as a general rule, arriving at a verdict by lot or chance, or in any other way except by the exercise of the judgment and by weighing the evidence, constitutes such misconduct on the part of the jury as will vitiate their verdict. The word chance has not been adopted or defined as a law term and is not technical. According to the generally accepted and ordinary use of the word, anything is said to have happened by chance to anyone, which was neither understandingly brought about by his act nor pre-estimated by his understanding. Hence a juror may be said to resort to the determination of chance whenever he adopts any method of determination the steps and results of which are beyond his calculation and not followed or participated in by his understanding. Among verdicts of this character which have been held to be invalid are those which were arrived at by the tossing of a coin or drawing lots from a hat. The fact that each juror, when the verdict is returned, states that it is his verdict does not cure the defect, nor is the verdict made valid by the oath of the juror, since it is reached in a manner incompatible with submission to his oath.

"20. Quotient Verdicts.—In accordance with the general rule prohibiting chance verdicts, it is well settled that a verdict rendered in a civil action in pursuance of an agreement by the jurors to accept one-twelfth of the aggregate amount of their several estimates, without the assent of their judgment to such a sum as their verdict, is invalid. Such verdicts are regarded by the courts in the same light as gambling verdicts, and will invariably be set aside, just as if the jury had thrown dice or resorted to any other method of gaming to determine the amount. In neither case is the sum arrived at the result of the deliberate judgment of the jury, but is the result of chance and self-imposed coercion, foreclosing deliberation and exchange of views. In such a case, every sum that goes to develop the verdict is a chance sum, save the sum that the juror himself sets down; and the verdict is not redeemed from being a chance verdict as to each juror, and therefore chance as to all, by the fact that each has contributed to it an element not of chance, any more than a dice throw would be redeemed from being chance by the fact that the throw was in fact controlled by certain intentional motion of the dice box."

The text is supported by a long list of cases in the

notes thereto, each of which supports what the writer thereof states, to the effect that a verdict based upon an agreement *in advance* by each juror to abide by a quotient so arrived at is in substance and effect a verdict reached by lot; for, after all, a verdict reached by lot, technically speaking, is only one that is arrived at by chance. Therefore, if there is no reservation on the part of the jurors to disagree to the final quotient his ultimate agreement to return it as a verdict in pursuance to his prior agreement to do so has none of the qualities of a consent to the amount as so calculated, and that it is nothing but a sum arrived at by lot. It will be observed that the text points out that under such arrangement (of an agreement in advance to abide by the quotient) it is rendered possible for some jurors to write down extravagant amounts so as to enlarge the final quotient which it has been agreed should be the amount of the verdict, and which differs but little, if any, as to correct and just practice from the old ancient plowshare method of determining issues of fact, or the throwing of dice or the adoption of any other uncertain chance method. We, therefore, conclude that a verdict rendered as defendant charged that the instant one was done is a verdict reached by lot and that the jurors who returned it are competent to testify to the facts and if found to be as charged by defendant in its amended motion for a new trial, the verdict should be set aside. However, the error in the instruction which we have sustained is itself sufficient to authorize a reversal of the judgment and, perhaps, the error embodied in ground (3) will not occur on another trial.

Wherefore, for the reasons stated, the judgment is reversed, with directions to sustain the motion for a new trial, and for proceedings consistent with this opinion.