JERMAINE GRAY, AN INFANT BY HIS GUARDIAN AD LITEM, KAREN GRAY AND KAREN GRAY, INDIVIDUALLY, PLAIN-TIFFS-APPELLANTS, v. DIANE POPE A/K/A DIANE PHIL-LIPS, DEFENDANT-RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued September 27, 1989—Decided October 11, 1989.

Before Judges SHEBELL and KEEFE.

*Robert A. Ungvary* argued the cause for appellants (*Forman, Forman, Cardonsky, Andril,* attorneys; *Robert A. Ungvary,* of counsel and on the brief).

*Albert E. Fershing* argued the cause for respondent (*Shurkin & Fershing,* attorneys; *Monique R. Franco,* on the brief).

The opinion of the court was delivered by

SHEBELL, J.A.D.

Plaintiffs Jermaine Gray, an infant, and his mother Karen Gray, individually and as his guardian, appeal from the entry of a judgment of no cause for action in favor of defendant Diane Pope based upon a jury verdict which found the infant plaintiff pedestrian to be 57% negligent and the defendant auto driver to be 43% negligent in the happening of an accident that occurred on March 26, 1984.

At about 4:30 p.m. on March 26, 1984, infant plaintiff, then age 7, was walking home alone from a candy store located on the southeast corner of Lafayette Street and Orange Avenue in Irvington. Plaintiff was attempting to cross Orange Avenue as defendant was operating her automobile in a northerly direction on Orange Avenue.

According to defendant's testimony on direct examination:

I had spotted the little boy in between cars, proceeded to go, and next thing I heard was a thump. And my girlfriend said, I think I hit him. I stopped. Looked in my rearview mirror. I saw him lying on the ground.

However, on cross-examination when asked whether she said that she saw the boy between the cars, she answered, "[y]eah, I'm not sure if it was between cars, but I remember seeing him."

Defendant asserted she was traveling 15 to 20 miles per hour when she observed the boy about 10 feet from her car "just standing there." She stated that she saw the boy looking towards the right and did not ever see him looking towards her. She estimated that 30 seconds passed from the time she first saw the boy standing on the side of the street until the time she heard the thump and that her car was continuously in motion during that interval. Defendant admitted that she might have been more than 10 feet away from the boy when she first observed him in light of her testimony that 30 seconds elapsed between the time she saw him and the time of the impact. When asked whether she honked her horn during that period of time, she answered, "[h]onk my horn? For what?"

She acknowledged the boy was "just standing there ... [o]ff the curb" indicating that he was in the street and that it did not occur to her that he might begin to cross the street. Defendant stated that she did not look again after the first time when she saw the child "because I was talking to Evelyn at that time. She was telling me what street to turn." She agreed under cross-examination that there was nothing, including cars, blocking her view of the boy.

The damage to defendant's vehicle was on the passenger side, involving the mirror and the steel rim around the door which was dented in. A witness called by the defense, a young school boy, maintained that he saw the infant step off of the curb, take two steps and start to run although he did not see him run. The witness stated that he then looked away from the infant, and after a lapse of 10 to 15 seconds heard the collision and saw the boy laying on the ground with blood all over the ground.

Following the jury verdict, plaintiffs moved for a new trial and urged for the first time that the jury verdict, in addition to being against the weight of the evidence, was the result of an erroneous instruction to the jury that permitted it to return an improper quotient verdict. This motion was denied.

Our review of the record satisfies us that the court's instruction to the jury constituted plain error under *R.* 2:10—2, thereby requiring reversal. Plain error exists when "the language employed by the trial judge in guiding the deliberations of the jury constitutes a legal impropriety affecting the substantial rights of the party affected of sufficiently grievous nature to justify notice by the reviewing court and to convince the court that, of itself, the error possessed a clear capacity to bring about an unjust result." *Vespe v. DiMarco,* 43 *N.J.* 430, 435–36 (1964), citing *State v. Corby,* 28 *N.J.* 106, 108 (1958). *See also Parentini v. S. Klein Dept. Stores,* 94 *N.J.Super.* 452, 457 (App.Div.), certif. den. 49 *N.J.* 371 (1967).

It has been the long-standing policy of this State that a quotient verdict, *i.e.,* one where the jury takes the sum of each estimate submitted by the jurors and divides it by the numbers of jurors, is not acceptable where it appears that there was a positive agreement to abide by the result of such a process thereby permitting the jurors to surrender their independent judgments to such a method of compromise. *Cerf v. Smolderen,* 39 *N.J.Super.* 222, 229 (Law Div.), certif. den. 22 *N.J.* 221

(1956); *Juliano v. Abeles*, 114 *N.J.L.* 510, 513 (1935); *Pushcart v. N.Y. Shipbuilding Co.*, 85 *N.J.L.* 525, 527–28 (1914).

Here, the trial judge mistakenly concluded that the jury's responses to the court during deliberation indicated that the jurors "were starting to give me as to the percentages was what might be called a quotient verdict, and a quotient verdict is where the jury takes the number of each estimate submitted by the jurors, divides it by the number of jurors and brings in that figure." The record does not justify the impression of the trial judge in that regard.

The jury was having difficulty finalizing its deliberations as evidenced by jurors' statements in open court when the jury attempted to report its verdicts. The jury reported that it found that the defendant Diane Pope was negligent by a vote of 5 to 1 and that the plaintiff Jermaine Gray was negligent by a unanimous vote. At that time, the jury did not indicate the percentages of negligence attributable to each party.

After further deliberation, the jury returned to court and certain individual jurors informed the court of their personal vote as to the percentage of negligence attributable to each of the parties. Thus it merely appeared that the jury had not reached a collective verdict, but had instead recorded how each juror had voted on the issue of the percentage of negligence attributable to each party. Before all of the jurors could be polled, the court properly interrupted stating,

> [n]o, it's no good. You have to agree, ladies and gentlemen, on the collective percentage for the defendant and the plaintiff. It's not a question one saying 75, one saying 40, one saying 60 and dividing it up and getting—and compromising. You have to agree on a percentage for each one. So I'll have to ask you to return again to the jury room continue deliberations.

After approximately a half hour of further jury deliberations, the court, apparently without further inquiry from the jury, advised the attorneys: "Gentlemen, I think the jury is having some difficulty, so I'm going to try to clear it up and explain to them what I'm talking about. If they didn't understand it completely." The court then, without objection, summoned the

jurors and began its instruction regarding quotient verdicts telling the jury that a strict quotient verdict

would necessarily cause the trial judge to have to set aside the verdicts. But on the other hand, such a verdict is *only* bad if there is a positive prior agreement to abide by the result of this process.

So if a juror—a jury states the percentage that he thought that plaintiff was negligent or the percentage and/or that the defendant was negligent, and divides the sum by the number of the jurors, and it is done without any prior agreement between jurors that they would be bound by such a process, that would be a legal verdict.

In other words, the problem that arises when all the jurors agree beforehand we will just take a consensus of the figures or the sum and we'll divide it by six. This would obviously be a prior agreement as to a compromise.

*But if each of you jurors comes to different figures by your own reasoning and your own judgment and then should add them up and divide, that would be a proper verdict.* So I wanted to inform you of that. The danger is agreeing beforehand, we will compromise this without saying the word compromise, we'll compromise this by just taking the percentages and dividing them up and doing this. That would be no good because we can do that without having a jury or a Court or anything else.

*But if everybody comes to their own conscientious percentage, and then they're willing and having listen to everybody else's argument the—it's split up in that fashion, there's nothing illegal about that.* But maybe that will help you some on this, okay? [Emphasis supplied].

After some further sidebar discussion with counsel, the court continued:

Ladies and gentlemen, by my supplemental instruction, I want to indicate that all I told you is to aid you and suggest a method of arriving at a verdict, but that doesn't mean that you couldn't arrive at a verdict from your own independent means.

But if you're rendering a verdict in that fashion, as I thought you were when you started to give me the percentages, this would be a proper method to do it, but it's not the only way to do it. As long as all of you exercise your own conscientious judgment, okay?

■ The instruction of the court on quotient verdicts constituted reversible error. The court's initial error was in suggesting to the jury that they might employ an averaging method in arriving at their verdict, when there was insufficient basis in the record to warrant opening the door to such an instruction. Of greater significance is the court's error in giving an instruction which permitted the jury to return a strict quotient verdict

without assurance that the verdict would be in accord with their own independent judgment as to the proper verdict.

The court's direction to the jury plainly advised the jurors that they could properly, as an alternate method, arrive at a verdict which was the average of the percentages found by each juror. The court's caution that it was a "proper method to do it ... [a]s long as all of you exercise your own conscientious judgment ..." was insufficient to convey to the jurors that each must agree that the resulting average percentages constituted their own individual conscientious judgment as to the proper and just result. *See Suhaysik v. Milwaukee Cheese Co.*, 132 *Wis.*2d 289, 299–302, 392 *N.W.*2d 98, 103 (Ct.App.1986).

The jurors were thus led to believe that as long as they exercised their own conscientious judgment, with regard to their individual determination that would then go into the average, they could return a verdict which merely reflected the average of those independent conscientious judgments, even though a juror might disagree with the ultimate outcome. It is imperative if an averaging method is employed that each juror approve the resulting average as a just verdict. *Id.* This important condition was not clearly conveyed to the jury.

This error was particularly harmful in this case because one of the jurors voted in favor of 100% negligence on the part of the infant and no negligence on the part of the defendant. The inclusion of that particular juror's percentages clearly was capable of bringing about the possibility of a verdict which would be contrary to the views of the majority of the jurors as to the ultimate verdict to be arrived at. The result however would nonetheless have satisfied the court's charge as to a proper verdict based upon the averaging of the determinations of the individual jurors as they had reported their individual determination based upon their own conscientious judgment.

In view of our reversal based on the erroneous jury charge, we find it unnecessary to determine whether the verdict is also against the weight of the evidence.

Reversed and remanded.