876 A.2d 269

STEPHEN SHANKMAN, PLAINTIFF–CROSS–RESPONDENT, v. STATE OF NEW JERSEY, ITS AGENTS, SERVANTS AND EMPLOYEES, NEW JERSEY DEPARTMENT OF TRANSPORTATION, ITS AGENTS, SERVANTS AND EMPLOYEES, SALVATORE J. MAVURO, JR., JOHN DOES 1–5, (SAID NAMES BEING FICTITIOUS), ABC CORPORATION 1–5 (SAID NAMES BEING FICTITIOUS), AND ABC PUBLIC ENTITIES 1–5 (SAID NAMES BEING FICTITIOUS), DEFENDANTS, AND CONTI ENTERPRISES, ITS AGENTS, SERVANTS AND EMPLOYEES, DEFENDANT–CROSS–APPELLANT.

DORA SHANKMAN, PLAINTIFF–APPELLANT AND CROSS–RESPONDENT, v. STATE OF NEW JERSEY, ITS AGENTS, SERVANTS AND EMPLOYEES, NEW JERSEY DEPARTMENT OF TRANSPORTATION, ITS AGENTS, SERVANTS AND EMPLOYEES, SALVATORE J. MAVURO, JR., STEPHEN SHANKMAN, JOHN DOES 1–5, (SAID NAMES BEING FICTITIOUS), ABC CORPORATION 1–5 (SAID NAMES BEING FICTITIOUS), AND ABC PUBLIC ENTITIES 1–5 (SAID NAMES BEING FICTITIOUS), DEFENDANTS, AND CONTI ENTERPRISES, ITS AGENTS, SERVANTS AND EMPLOYEES, DEFENDANT–RESPONDENT AND CROSS–APPELLANT.

Argued March 28, 2005—Decided July 13, 2005.

188

*Kenneth S. Javerbaum* argued the cause for appellant and cross-respondent (*Javerbaum Wurgaft Hicks & Zarin*, attorneys).

*William H. Mergner, Jr.*, argued the cause for respondent and cross-appellant (*Leary, Bride, Tinker & Moran*, attorneys).

*Stephanie Ann Mitterhoff* argued the cause for cross-respondent (*Bramnick, Rodriguez, Mitterhoff, Grabas & Woodruff*, attorneys).

Justice LaVECCHIA delivered the opinion of the Court.

This is a consolidated personal injury case involving claims by a husband and wife against multiple defendants. The posture of the appeal is influenced by the fact that the wife's claims included a count of negligence against her husband, the driver of the vehicle in which she was injured, that was settled prior to trial.

Chief among the issues raised before us is an allegation that an illegal "quotient verdict" was rendered by the jury. In their appeal to the Appellate Division, plaintiffs Dora and Stephen Shankman contended that the jury appeared to have used a quotient method in reaching its verdict, and that the trial court had a duty to inquire further of the jury to determine whether an illegal "quotient verdict" had occurred when the court was asked directly to do so by Dora's counsel. The Appellate Division agreed that the trial court erred in declining to inquire of the jurors under the circumstances, and set aside the jury's verdict on liability apportionment. Dora has petitioned for certification, contending that she is entitled to a new trial on both liability and damages.

Defendant Conti Enterprises primarily asserts that the jury verdict was proper and should be restored. Conti also filed a cross-petition concerning certain evidential issues. Specifically, it contends that it should be permitted to inform the jury that Dora

sued her husband and that she alleged in her pleading that he was speeding at the time of the accident. Further, Conti contends that the trial court correctly allowed the jury to hear that Stephen's insurance company had settled with Dora.

We granted the petition, 182 *N.J.* 427, 866 *A.*2d 984 (2005) and cross-petition, 182 *N.J.* 428, 866 *A.*2d 984 (2005), and now hold that a new trial on both liability and damages must occur. We further hold that the Appellate Division correctly restricted on retrial what the jury may be told in respect of Dora's pleadings and the fact that Stephen's insurer had settled.

## I.

Late in the evening of December 16, 1996, Stephen and Dora were involved in the automobile accident that is the subject of this civil action. Following a dinner with friends at a restaurant in Oakland, New Jersey, the Shankmans left at about 11 p.m. to return to their home in Maple Glen, Pennsylvania. During their journey Dora began to doze. She was asleep in the passenger seat at the time the accident occurred. Stephen was driving southbound on Route 287 when, without warning, at milepost 21.3 near the intersection between Route 287 and Route 78, a large Caterpillar backhoe driven by Salvatore J. Mavuro pulled out in front of the Shankmans' car. The vehicles collided causing catastrophic injuries to the Shankmans.

At the time of the accident, Conti Enterprises was performing a road-widening project under a contract with the State. The roadwork necessitated right lane closures and was being performed at night to minimize disruption to highway traffic flow. The State's contract with Conti Enterprises established safety procedures that Conti was duty-bound to follow. Specifically, Conti was required to use a "chase vehicle" to escort slow-moving construction equipment and to employ a police-engineered slow down of oncoming traffic before construction equipment was permitted to enter a lane of travel.

Mavuro was aware of those safety procedures; however, he testified that when the site superintendent ordered him to move the backhoe he believed that the request was urgent. Therefore, he moved the equipment immediately, without waiting for an escort or for a slow down. Defendants, Conti Enterprises and the State of New Jersey, did not dispute that Mavuro deviated from safety standards in moving the vehicle into a live lane of traffic. Mavuro pulled into the left lane at an estimated speed of ten miles per hour and was struck from behind by the Shankmans' vehicle ten to fifteen seconds later. Because neither Stephen nor Dora has any recollection of the accident, the only direct testimony about the accident came from Mavuro.

Dora suffered severe pelvic fractures, severe comminuted fractures of her right femur and tibia and multiple fractures of her right forearm, her right foot, and her right clavicle. The injury to Dora's foot was extensive. Ultimately, she lost a significant portion of her foot causing her shoe size to shrink from a size eight and one-half to a size four and one-half, leaving her with a pronounced limp and an inability to stand or walk for any extended period of time. Stephen was seriously injured also. He experienced pulmonary swelling, a concussion, a liver hematoma, pelvic fractures, sternum fractures, right tibia fractures, fibula and ulna fractures, a lacerated tongue, and broken teeth.

The police issued summonses to both Stephen and Mavuro. Mavuro was cited for obstructing the passage of a vehicle and Stephen was cited for careless driving. Accompanied by his attorney, Stephen pled guilty to a reduced charge of obstructing the passage of a vehicle, with the reservation that the plea could not be used as evidence in any civil proceeding. Uncounseled, Mavuro also pled guilty to obstructing the passage of a vehicle and there was no civil reservation.

Both Dora and Stephen filed complaints, later consolidated by the Superior Court, alleging personal injury claims arising from the accident. Dora's suit named Stephen, Conti, Mavuro, and the

State as defendants. Stephen's named only Conti, Mavuro, and the State.

Dora's complaint alleged, among other things, that Stephen had been traveling at a high rate of speed at the time the accident occurred. Although the claim against Stephen was settled by his automobile liability insurer prior to trial, Dora later testified that she had not believed her husband to be negligent and had not wanted to file against him, but was advised by her original attorney that it was typical to name as defendants all who were involved in the accident. To prepare a defense, Stephen's automobile insurer hired accident reconstructionist, William Martin. Martin produced an analysis of the accident that estimated that Stephen had been driving between 42 and 54 miles per hour in an area where the posted speed limit was 45 miles per hour. After receiving that report, Stephen's insurer negotiated a settlement for $400,000 in exchange for a stipulation of dismissal as to him. Dora's claims against the remaining defendants proceeded to trial, along with Stephen's claims against the same defendants.

At trial a number of issues arose. We mention those that factor into the allegations of error advanced before us. One concerned use of the settlement in respect of Stephen. The attorneys for both Dora and Stephen moved *in limine* to bar any evidence of the settlement pursuant to *N.J.R.E.* 408. The trial court disagreed, finding Model Charge 1.17 (informing jurors about absent settling defendants) to be informative on the question of admissibility notwithstanding Stephen and Dora's argument that Stephen was not an absent settling defendant; rather, he was a present and participating party, whose liability was directly in issue. Nonetheless, the trial judge ruled that evidence of the settlement was admissible and, thereafter, throughout the trial the defense was permitted to make references to the complaint's allegations of negligence on Stephen's part and to the fact of the pre-trial settlement.

The defendants focused on Stephen at trial, choosing as a matter of strategy not to contest Mavuro's negligent operation of

the machinery or the Shankmans' injuries. Instead, the defendants sought to convince the jury that Stephen also had been negligent, either because he was traveling at an excessive rate of speed or because he had fallen asleep behind the wheel. As for Dora, the defendants contended that she too was negligent for not staying awake and helping her husband by "co-piloting" as the two drove home late at night.

To counter the allegation of speeding, the Shankmans inexplicably retained as their trial expert the same accident reconstructionist previously hired by Stephen's insurer. Martin conducted a second analysis, described as more thorough than his first, and concluded that the Shankman car was traveling at a rate of speed between 40 and 45 miles per hour and therefore was within the posted speed limit. Not surprisingly, Conti attacked Martin's credibility and produced an expert who testified that the Shankman car must have been traveling at over 60 miles per hour and that Stephen would have been able to stop in time had he had been driving at only 45 miles per hour.

At the conclusion of the trial, the court instructed the jury on its use of the settlement evidence.

> Now, you have heard that Stephen Shankman was originally named as a defendant in this case. Before the case started he settled and that means that he resolved his differences in regards to this lawsuit.

> You are not to speculate as to the reasons why the plaintiff and defendant settled their dispute in regard to this lawsuit. You should not be concerned about the amount, if any, that may have been paid to resolve the claim against Mr. Shankman.

In respect of Dora's complaint and the allegations that it contained against Stephen, the jury was told:

> There was some discussion about pleadings in this case which is a concept that may be new to many of you. And you have heard that Dora Shankman and her complaint in this case charged Steven [sic] Shankman with driving their vehicle at a high rate of speed and with negligence proximately causing her injuries in her complaint.

> You may consider those charges of Dora Shankman as evidence of fault against Steven [sic] Shankman and you may give that evidence whatever significance and whatever weight you deem appropriate.

The jury began deliberations on a Friday and continued late into the afternoon. Eventually, the court and counsel conferred on whether the jury should be excused for the weekend. They also discussed the fact that the court clerk, who normally operated the courtroom video-recording system, could not stay later than 5:20 p.m. that afternoon, but that the trial court could wait until 6:00 p.m. for the jury's return. It was decided that the court clerk would instruct the judge on how to operate the video-recording system for the interval in which the clerk would not be present, thereby solving that problem, and that the jurors would be brought back into the courtroom to inform them about the arrangements being made for them to deliberate until 6:00 p.m. The jury's return also permitted the court to inquire whether the jurors might be able to conclude their deliberations by that time.

THE COURT: Okay. We have—let me just ask you while you're out here. We have made arrangements to stay until six o'clock. Do we feel that you're going to be done by six o'clock because if you're not I will excuse you and then we're going to have to come back Monday? But that's really the outside limit of when we can stay until.

JURY FOREPERSON: *I think we're going to need Monday.*

THE COURT: *You are going to need Monday.*

JURY FOREPERSON: *We don't need much time, but I don't think half an hour—*

THE COURT: Well—

UNIDENTIFIED JUROR: I think there's a possibility. There's a possibility. Yeah.

THE COURT: Well, if you want to try, go ahead.

JURY FOREPERSON: I think that's what we'll do.

THE COURT: Okay. Thank you.

The jury resumed deliberating and shortly thereafter, announced that it had reached a verdict. In respect of Stephen's claims, it found no cause of action. In respect of Dora's, the jury found that the State had committed no negligence; however, it concluded that Conti, Dora, and Stephen all had been negligent. It further found that although Conti's negligence and Stephen's negligence were proximate causes of the accident, Dora's was not. The jury assessed forty-two percent of the responsibility for the

accident to Conti and fifty-eight percent to Stephen. It awarded damages in the amount of $1,644,000.00.

Dora's attorney asked that the jury be polled in respect of the allocations of fault.

**THE COURT:** Okay. The—as to Question 9B, the answer was 42 percent, was that your vote, Juror No. 1?

**JUROR NO. 1.:** No.

**THE COURT:** Okay. 2?

**JUROR NO. 2:** I'm sorry, I don't—

**THE COURT:** You just have to tell me if you agree with the vote.

**JUROR NO. 1:** Yeah. We agree with it, that's a different question. I'm sorry.

**THE COURT:** I'm sorry. The answer was 42 percent. Was that your vote?

**JUROR NO. 1:** No, it was not my vote.

**THE COURT:** Okay. No.—Juror No. 2?

**MR. MERGNER [counsel for Stephen]:** That's not the question.

**MR. STAEHLE [counsel for the State]:** That's not the question Your Honor.

**UNIDENTIFIED JUROR:** Yeah, it's—

**MR. MERGNER:** Do you agree that that's the verdict?

**THE COURT:** Well, that's not how—

**MR. STAEHLE:** Do you agree with—

**THE COURT:** That's not—that's not—

**MR. STAEHLE:** Do you agree with the verdict.

**MR. JAVERBAUM [counsel for Dora]:** No. I—

**THE COURT:** No.

**MR. JAVERBAUM:** I want to know how each juror voted.

**THE COURT:** That's not how I usually do it. So you—

**MR. MERGNER:** Well, then you should first ask him was it 8 to 1 or 9 to—9 to zero.

**JURY FOREPERSON:** It might be easier if I were to explain what we did, but I don't want to speak out of line.

**THE COURT:** Well, no. I just need to know if it was not unanimous, they're trying to find out whether the count is correct. So Question 9B was not unanimous.

**JURY FOREPERSON:** The count is—

**UNIDENTIFIED JUROR:** Yes.

**JURY FOREPERSON:** The number is accurate as to what we decided on, but stop me if—

**THE COURT:** Go ahead.

**JURY FOREPERSON:** *What we had done was we voted, each nine of us what we saw the percentage to be and then we averaged so we came up with a consensus.*

**THE COURT:** Okay. But so the—

**JURY FOREPERSON:** *But nobody voted 58 to 42 specifically as an individual.*

**THE COURT:** All right. Then I guess the proper question is do you agree with the verdict.

**MR. STAEHLE:** Yes.

**MR. MERGNER:** Right.

**MR. STAEHLE:** Yes, Your Honor. That's the proper question.

**THE COURT:** Okay. I have done it the other way though too.

**JURY FOREPERSON:** That's what we were wrestling with.

**THE COURT:** All right. Thank you. All right. Then we will-then we will ask that. So Question 9B, the answer is 42 percent. Do you agree with that verdict? (Jury polled as to 9B, 9 to 0)

**THE COURT:** Okay. Question 9C was 58 percent. Do you agree with that verdict? (Jury polled as to 9C, 9 to 0)

**THE COURT:** And you wanted 11 too?

**MR. JAVERBAUM:** Yes.

**THE COURT:** Okay. The figure of $1,644,000. Did you agree with that figure? (Jury polled as to 11, 9 to 0)

**THE COURT:** Okay. Thank you. You're done.

Based upon the foreperson's statements, Dora's counsel requested a side bar and voiced his concern that the jury may have reached their verdict improperly "by taking an average of their individual calculations [of percentages]." Counsel requested that the court question the jurors to determine if that was the way they had calculated the damages. The trial court declined counsel's request, stating "I don't think that I'm supposed to. I think there's caselaw that says that I may not inquire into their deliberations." The jury was then dismissed.

Dora and Stephen appealed. In an unpublished opinion, the Appellate Division reversed and remanded for a retrial on the question of liability in respect of Dora's claims. Upon reviewing the transcript of the last day of trial, the panel determined that the exchange between the court and the jurors, in which the jurors revealed that they had averaged their individual liability assessments, in the totality of the circumstances made it fairly inferable that a quotient verdict occurred. Acknowledging that it could not

know for sure what had transpired without the benefit of having had further inquiry by the trial court, the panel determined that it could not regard the trial court's dereliction in not performing that inquiry as harmless error. The panel concluded that that would be unfair to Dora, who had requested the inquiry at the time the juror averaging was revealed.

The panel also found reversible error in the trial court's instruction about Dora's complaint and the allegations that it contained against Stephen, explaining that "the [court's] statement that Dora's complaint was evidence of [Stephen's] fault had the clear capacity to affect the jury's deliberations, both as to existence of fault and the percentage of fault." The court remanded for further proceedings, but added that because Dora had not appealed on the quantum of damages, retrial of the cause would be limited to the issue of liability only. A motion for reconsideration resulted in reaffirmation of the limited remand.

## II.

### A.

A "quotient verdict" is commonly defined as having occurred when

> there [is] a preliminary agreement or understanding among the jurors that each will select a figure as representing his opinion of value or damage and that the sum of said amounts divided by the number of jurors will be accepted by each as his or her verdict, and is in fact so accepted.
>
> [*Marks v. State Road Dept.*, 69 So.2d 771, 773 (Fla.1954).]

*See generally* Annotation, *Comment Note—Quotient Verdicts*, 8 *A.L.R.*3d 335, 339 (noting universal agreement on definition of "quotient verdicts"). As a general matter, there is nothing intrinsically wrong with a jury's use of an averaging methodology to determine its award. 58 *Am.Jur.2d New Trial* § 287 (2004). Use of averaged figures for purposes of discussion and deliberation is not improper; rather, it is the advance agreement to be bound to the averaged amount, whatever it may be, that renders a "quotient verdict" objectionable. *Ibid.* "[T]he verdict of the jury should

represent the opinion of each individual juror. . . . The very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves." *Allen v. United States,* 164 *U.S.* 492, 501, 17 *S.Ct.* 154, 157, 41 *L.Ed.* 528, 531 (1896). Citing somewhat differing rationales, the general consensus among the courts that have considered them is that quotient verdicts agreed to in advance conflict with the jury's function.

Some courts have denounced such verdicts as illegal, analogizing them to gambling, or as a resort to chance, because at the time the agreement is made the jurors do not know the ultimate amount to which they have been committed. *See, e.g., Clark v. Foster,* 87 *Idaho* 134, 391 *P.2d* 853, 855–56 (1964); *Blevins v. Al Weingart Truck & Tractor Serv., Inc.,* 186 *Kan.* 258, 349 *P.2d* 896, 901–02 (1960); *Westbrook v. Hutchison,* 195 *S.C.* 101, 10 *S.E.2d* 145, 151 (1940); *Dothan v. Hardy,* 237 *Ala.* 603, 188 *So.* 264, 268 (1939); *Long v. Collins,* 12 *S.D.* 621, 82 *N.W.* 95, 96 (1900); *Dixon v. Pluns,* 98 *Cal.* 384, 33 *P.* 268, 269 (1893); *N. Texas Producers Ass'n v. Jenkins,* 342 *S.W.2d* 192, 195 (Tex.Civ.App.1960); *Louisville & N.R. Co. v. Marshall's Adm'x.,* 289 *Ky.* 129, 158 *S.W.2d* 137, 142 (1942); *Honigsberg v. New York City Transit Auth.,* 43 *Misc.2d* 1, 249 *N.Y.S.2d* 296, 300 (N.Y. Trial Ct 1964). Others' criticisms have emphasized that the determination is not based upon the deliberate judgment of each member of the jury. *See, e.g., Ehalt v. McCarthy,* 104 *Utah* 110, 138 *P.2d* 639, 647 (1943); *Burke v. Magee,* 27 *Neb.* 156, 42 *N.W.* 890, 891 (1889). Similarly, several courts have commented on the problematic capacity of a quotient verdict to permit a single member of the jury to exert disproportionate influence on the verdict by recommending an amount that is substantially higher or lower than the amounts recommended by the rest of the jury. *See, e.g., Louisville & N.R. Co., supra,* 158 *S.W.2d* at 143; *Killion v. Dinklage,* 121 *Neb.* 322, 236 *N.W.* 757, 759 (1931) *rev'd on other grounds, Schrage v. Miller,* 123 *Neb.* 266, 242 *N.W.* 649 (1932); *Southern R. Co. v. Williams,* 113 *Ala.* 620, 21 *So.* 328, 329 (1896); *N. Texas Produc-*

*ers Ass'n, supra,* 342 *S.W.*2d at 195; *Louisville & N.R. Co., supra,* 158 *S.W.*2d at 142.

To be sure, the slight variation in criticism is overwhelmed by the consensus that quotient verdicts are flawed, ultimately, because of the prior agreement to be bound. *See generally Quotient Verdicts, supra,* 8 *A.L.R.*3d at 335. *See also Marks v. State Road Dept., supra,* 69 *So.*2d at 773 (noting that "[q]uotient verdicts are universally condemned"). The decisional law of this State is in accord with that condemnation.

### B.

Our courts have long recognized that it is the prior agreement to be bound, when such agreement has the capacity to foreclose all subsequent discussion, deliberation, or dissent among jurors, that is inconsistent with the essential jury function and is, therefore, the core difficulty with an impermissible quotient verdict. As long ago as 1842, quotient verdicts that were discovered to have occurred were treated as the equivalent of juror misconduct that required the setting aside of the judgment. *See Kennedy v. Kennedy,* 18 *N.J.L.* 450, 452 (Sup.Ct.1842) (stating that "every verdict should be the result of the exercise of judgment and reflection, and whenever it is made to appear to the court, by satisfactory proof, to have been the effect of chance or lot, or any other contrivance, it will be set aside").

Decisions subsequent to *Kennedy* emphasized that it was the agreement in advance to be bound by the quotient verdict, no matter the figure that results, and the adherence then to the "agreement," as opposed to the figure, that was abhorrent to the very notion of the jury's function. *Pushcart v. New York Shipbuilding Co.,* 85 *N.J.L.* 525, 527–28, 89 *A.* 980 (Sup.Ct.1914). As *Pushcart* explained,

> in order to hold that the finding of a jury is a quotient verdict it must also appear that there was a positive prior agreement to abide by the result of this process, and even if there may have been such an agreement, if the jury subsequently refused to abide by it, and find a verdict greater or less than the quotient, it would not be error.

[*Ibid.*]

The Appellate Division has adhered consistently to *Pushcart's* statement of the rule. *See Gray v. Pope*, 236 *N.J.Super.* 206, 565 *A.*2d 411 (App.Div.1989); *Cavallo v. Hughes*, 235 *N.J.Super.* 393, 562 *A.*2d 818 (App.Div.1989); *Cerf v. Smolderen*, 39 *N.J.Super.* 222, 120 *A.*2d 793 (Law Div.), *certif. denied*, 22 *N.J.* 221, 125 *A.*2d 234 (1956). The only significant permutation in the law occurred in *Cavallo, supra,* when the Appellate Division recommended that whenever the issue of a "quotient verdict" arises "the trial judge [should] specifically inquire whether there was a prior agreement." 235 *N.J.Super.* at 398 n. 2, 562 *A.*2d 818 (holding nonetheless that trial court's failure to do so was not plain error).

■ We note with approval that development because it taught the trial courts not to begin, and end, an inquiry into an allegation that an illegal quotient verdict occurred with a myopic focus on whether there exists any evidence that the jurors agreed to average their views. Proof of such averaging is, alone, insufficient to have unearthed an illegal quotient verdict.

> The objectionable aspect of such agreements is that jurors who participate in quotient verdicts "agree, without knowing in advance what the quotient will be, to be bound by it and to foreclose the opportunity for further discussion and for comparison and evaluation of individual juror's positions, ... [and such verdicts are thus arrived at] through a process of chance or gambling and are not founded upon discussion, deliberation, reasoning, and collective judgment in which each juror has an opportunity for individual participation."
>
> [*Cavallo, supra,* 235 *N.J.Super.* at 398, 562 *A.*2d 818 (quoting *Quotient Verdicts, supra,* 8 *A.L.R.*3d at 340).]

In *Cavallo,* the Appellate Division recognized that the trial court already had a sufficient explanation of what had occurred during deliberations enabling both the trial court and the reviewing court to be satisfied that, after engaging in an exercise of averaging, the jury nonetheless confirmed its approval of the averaged amount "by the required number [so] that the final percentage of fault represent[ed] its collective appraisal of the issue to be decided." *Supra,* 235 *N.J.Super.* at 398, 562 *A.*2d 818. We agree with the Appellate Division in *Cavallo* that that jury's verdict did not need to be set aside as an illegal quotient verdict. And, we agree with

the added measure of instruction that *Cavallo* offered—prompt follow-up questioning should be requested by counsel and provided by the trial court when there may be reason to question whether the verdict is the product of a prior agreement to be bound, instead of being the product of the jury's collective appraisal. *Id.* at 398 n. 2, 562 *A.2d* 818. With that fillip added by *Cavallo,* our case law requires no further adjustment, only application.

## C.

 The Appellate Division reversed the trial court below, essentially because the court did not follow the primer that had been provided to the trial courts by *Cavallo.* We agree with the panel that reversal was necessary.

The exchange that took place between the trial court and Juror 1 and the Foreperson contained more than a mere wisp of a suggestion of averaging. The jurors readily revealed that averaging was used to derive the liability percentages. Although that is not problematic in and of itself, what is problematic is that the exchange permitted the inference that that the jurors felt bound to an agreement to stick with the average once it was arithmetically derived, whatever that number turned out to be. As juror 1 stated when initially asked by the court, the allocation of forty-two percent liability for Stephen was not his vote. He then added, in seeming response to the court's follow-up explanation for needing to know about verdict unanimity ("[y]ou just have to tell me if you agree with the vote"), that "[y]eah. We agree with it, that's a different question." Later in the midst of the court's exchange with counsel, the jury foreperson explained that each juror came up with his or her percentage "and then we averaged so we came up with a consensus."

It may well be that the jury took the time during deliberations to be certain that the verdict as calculated through averaging was an acceptable verdict for each juror then deliberating. We, like the panel below, cannot be certain from the exchange that took place. It is a close question whether one reasonably could conclude

from the exchange that the jurors acted solely out of a sense of being bound in advance to a derived number when each said that he or she agreed with the verdict. However, it is because enough was uncovered to raise the specter of a prior agreement among the jurors, and an uneasy uncertainty about whether the liability percentages, which admittedly were derived by averaging, did reflect each juror's acceptance of those percentages as his or her final appraisal on that issue, that we must conclude that the court committed error in declining to inquire further to resolve those uncertainties when asked to do so by counsel. We hold that having been confronted by a specific request from counsel to inquire further, the trial court was duty bound to engage in further inquiry and to remove doubt about an illegal quotient verdict from the record for a reviewing court.

That the court did not do so in this instance requires reversal of the jury's verdict. The recommendation in *Cavallo* was more than a take-or-leave-it suggestion. It was a roadmap on how to avoid reversible error when situations such as these arise. To the extent that the issue of "quotient verdicts" has not arisen in a matter before us for awhile, we take this opportunity to note our agreement with the Appellate Division holdings that have emphasized that quotient verdicts are impermissible when jurors have agreed in advance to be bound by an averaged amount of damages or of liability percentages, without preserving the right and duty to assent finally and comfortably to the number derived from the average. By preserving a juror's ability to say, yet again, that he or she is of the opinion that the amount calculated by the jury as a whole is acceptable to him or to her, we can be satisfied that the verdict represents the independent opinion of each juror. And, thus, the jury will be permitted to fulfill the supremely important role entrusted to it in our jury trial system. *See Kennedy, supra,* 18 *N.J.L.* at 458 (Hornblower, J., concurring) (commenting that "in this country ... everything which a man holds dear, his life, reputation, liberty and property, is, in our court, placed in the hands of jurymen").

We require much of jurors. They "are sworn to try and determine the facts and law honestly, and make their verdict the result of deliberation and strict inquiry for the truth, applying their best, impartial and unprejudiced judgment to the case, as made out by evidence". *Ibid.* Although that statement was made in 1842, current expectations placed on jurors have not diminished. Indeed, our present model jury charges emphasize to jurors that each must maintain his or her individual judgment when deliberating:

> It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without compromising your individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with the other jurors.
>
> [*Model Jury Charge (Civil)*, 1.12(Q) "General Provisions and Outline for Standard Charge" (1998) ].

In our view, the Appellate Division panel below got this exactly right when it concluded that it could not tell for certain that averaging and an advance agreement to be bound thereby had occurred but that, because the suggestion of a prior agreement was there and because counsel made the precise request that he was required to make of the court to protect his client's interest, the court's failure to inquire further constitutes reversible error in this matter. In only one respect do we diverge from the Appellate Division's judgment.

■ Because the issue of damages was so closely intertwined with the liability determination, we conclude that the failure to have engaged in the inquiry that counsel requested in this matter necessitates a new trial on both damages and liability. The Appellate Division's brief comment that Dora did not appeal on the "quantum of damages" shortchanges the breadth of her argument about the quotient method that she asserted was used by the jury in reaching its verdict. Indeed, the jurors' ready response to use of averaging to come up with consensus did not appear to have been an explanation about how liability percentages alone were calculated. The Foreperson's explanation suggested a sweeping application. We have no confidence that damages were not taint-

ed by the ambiguity about the jurors' methodology. Moreover, Dora's counsel specifically requested that the court engage in further inquiry on the damages calculations.

In sum, counsel's request that the jurors be questioned about their methodology was stated broadly to encompass both liability and damages and was rejected at the outset by the trial court. We hold that it was reversible error for the trial court not to have engaged in further inquiry with the jurors on the quotient verdict issue, as it arose on this record, in respect of both liability and damages, when requested by counsel to do so. Thus, we reverse and remand for retrial on liability and damages on Dora's claims.[1]

## III.

■ In respect of the retrial, we add the following. Under our Court Rules, a plaintiff may join all persons as defendants in a cause of action where a claim may be asserted against them, jointly, severally, or in the alternative when "the right to relief ... arises out of or in respect of the same transaction, occurrence, or series of transactions or occurrences and involves any question of law or fact common to all of them." *R.* 4:29-1. And, it is well settled that that plaintiff may plead alternative or inconsistent claims. *R.* 4:5-6 (permitting alternative and inconsistent pleadings). *See Enriquez v. W. Jersey Health Sys.*, 342 *N.J.Super.* 501, 526, 777 *A.2d* 365 (App.Div.), *certif. denied,* 170 *N.J.* 211, 785 *A.2d* 439 (2001).

Against the backdrop of our liberal joinder practice that sanctions pleading in the alternative, it would be entirely discordant were we to permit factual assertions, which have been made by a pleader in one count against one party, to be used as an "admis-

---

[1] Stephen also is entitled to a new trial. We believe that the Appellate Division intended that he receive one. However, to the extent that is unclear, we hold that he should have a new trial because the jury's invalid liability determination that found Stephen fifty-eight percent responsible directly affected his right to recovery. Therefore, as a matter of fairness this matter must be retried in its entirety.

sion" against that pleader in an issue in another alternative or inconsistent count in the same cause of action. We have held as much. *Van Sickell v. Margolis*, 109 *N.J.Super.* 14, 18, 262 *A.*2d 209 (App.Div.), *aff'd o.b.*, 55 *N.J.* 355, 262 *A.*2d 203 (1970). In prohibiting such use of inconsistent or alternatively pleaded facts to ensnare a pleader, the opinion in *Van Sickell* cited an out-of-state court whose reasoning resonates in the present appeal:

> Alternative fact allegations made in good faith and based on genuine doubt are not admissions against interest so as to be admissible in evidence against the pleader. The pleader states the facts in the alternative because he is uncertain as to the true facts. Therefore, he is not "admitting" anything other than his uncertainty. An essential objective of alternative pleading is to relieve the pleader of the necessity and therefore the risk of making a binding choice, which is no more than to say that he is relieved of making an admission.
>
> [*McCormick v. Kopmann*, 23 *Ill.App.*2d 189, 161 *N.E.*2d 720, 729 (1959).]

The widow plaintiff in *McCormick*, was uncertain about the cause of the accident in which her husband was killed. *Id.* at 725. She brought a wrongful death claim against the truck driver involved in the collision and a Dram Shop Act claim against proprietors of the tavern that had served her husband that evening. *Id.* at 724. Although the claims were mutually exclusive, the widow was permitted to plead both counts together where she was in doubt about what the facts were and what the evidence would show. *Id.* at 725. And, the alternative allegations were not permitted to be used as admissions against her as the pleader. *Id.* at 729.

Dora's state of knowledge about the facts that would support the counts of her complaint was similar to that of the widow in *McCormick*. Dora was asleep at the time of the accident and did not know what the facts would show at trial in respect of her claims against Stephen, Conti Enterprises, and the State of New Jersey. That her complaint alleged facts in support of a negligence claim against Stephen (based on driving in excess of the speed limit) was not an admission by her, and we so hold. We agree with the Appellate Division that found error in the trial court's instruction permitting the jury to consider Dora's pleading in the count against Stephen as "evidence of fault against" Ste-

phen that the jury may give whatever measure of significance and weight it deemed appropriate. The complaint's allegations did not provide probative and relevant evidence to be weighed with the rest of the evidence; instead, they were extraneous and confusing. On retrial, the jury should not be so instructed.[2]

The Appellate Division also addressed the issue of the trial court's admission of evidence that Dora's claim against Stephen had been settled. The Appellate Division stated that the trial court found evidence that a settlement had been reached between Dora and Stephen to be relevant to establish bias. "Bias" was the Appellate Division's description. The trial court allowed the settlement to be mentioned because it feared that the jurors would be confused and misled if they learned of Dora's allegations against Stephen, but did not learn that she ultimately settled with him. Presumably, the Appellate Division thought that the settlement explained Dora's reasons for pointing the finger at Conti, and not Stephen. In any event, the bias focus, the panel noted, became lost during trial, to the point that defense counsel in summation "invited the jury to infer that settlement sprang from a recognition of Stephen's fault." We harbor the same grave reservations that troubled the Appellate Division about the prejudicial use of the settlement evidence.

Under our Rules of Evidence, parties may not introduce evidence of a settlement in order to show liability. *N.J.R.E.* 408. However, evidence of a prior settlement is admissible when it is

---

[2] We base our holding on the facts of this case. We acknowledge that courts and commentators debate the general admissibility of amended or superseded pleadings from prior lawsuits in later litigation, *see* Sherman J. Clark, *To Thine Own Self Be True: Enforcing Candor in Pleading Through The Party Admissions Doctrine*, 49 *Hastings L.J.* 565, 569–70 (1998); however, we are not required to reach that issue in this matter. We do note that in the context of that broader debate about the admissibility of pleadings, commentators nonetheless acknowledge a different rule for hypothetical or alternative pleadings, which tend to be excluded, to encourage a factually uncertain party to file rather than forego a meritorious claim. *Id.* at 570–72. That is the approach that *Van Sickell* endorsed and that we find applicable in this case.

offered for a different purpose. *Ibid.* The defense's use of the evidence in this case strayed into prohibited terrain. In our view, that misuse was triggered by the erroneous evidential ruling that admitted the allegations of Dora's complaint against Stephen and was compounded when the court instructed the jury that Dora's allegations could be considered evidence of fault. On retrial, the allegations of the complaint may not be used in that manner.

If on retrial, the trial court is confronted again with an argument that the settlement is relevant in some way to the represented cause of action, then we suggest that the trial court would be assisted in its evaluative process by engaging in the weighing of probative value and prejudicial effect required by our Rules of Evidence. Thus, if the fact of the settlement with Stephen is advanced as being relevant, the prejudicial effect of any mention of that settlement should be weighed against any probative value that is asserted. *N.J.R.E.* 403. When the probative value of an asserted bias by a plaintiff wife against her husband's co-defendants is minimal and cumulative, and the prejudicial value of the settlement is as great as it appeared to be in the initial trial of this matter, then the settlement should not be admitted. Admission of evidence about the settlement would put at risk the very policy rationale behind *N.J.R.E.* 408. That risk—that the jurors will be prejudiced and draw an inappropriate inference of liability—is a risk that is better avoided when engaging in *N.J.R.E.* 403 weighing.

## IV.

The judgment of the Appellate Division is affirmed, as modified by this opinion. We remand these matters to the Law Division for retrial on liability and damages.

*For affirmance as modified/remandment*—Chief Justice PORITZ and Justices LaVECCHIA, ZAZZALI, ALBIN, WALLACE and RIVERA–SOTO—6.

*Opposed*—None.